Mr. Rader, may it please the court, this appeal involves a factual issue that has to do with that we request to be considered de novo by this court, and specifically, there was never any evidence that all of the 16 heat shields in issue infringed the patent suit. And... Didn't Lynch state in his affidavit that he examined all of the items that were supplied? He only made a visual inspection. Dr. Holmes, you're talking about... Well, Holmes, we agree that everybody knows that Holmes only sliced one of them in two, right? He picked the one that was the smallest and the only one... But he did say in his affidavit, I have examined all of them, didn't he? His examination was not anything more than a visual power investigation which would not determine the issue of infringement. In order to determine the issue of infringement, you would have to, at a minimum, section the heat shields. And Dr. Chapman... Did you contest the summary judgment motion of non-infringement on the grounds that only one shield had been dissected? Yes. And consequently? We contested it by saying in our papers that... I'm talking about in response to the summary judgment motion, not later. Not when the motion in limine came up to limit your testimony. Well, let me explain that. We had in the summary judgment papers, as we indicated in our offer of proof of trial, answers to requests for admissions, which were directed towards whether all of the shields were the same, and we denied that request. That was part of the summary judgment paperwork. Further, Dr. Chapman, in his declaration, talked about sectioning all the shields, not just the one that was presented to the court. And he pointed out that because of the disparate shapes, other than the one that was symmetrical, which was presented to the court... What I was trying to get at is simply as a matter of the sort of Solitak summary judgment game, when the party comes forward and says, well, we've got a summary judgment non-infringement, and they put in evidence the Holmes' affidavit, right? Yes. Then you're going to have to counter that, because Holmes is, for whatever it's worth, he seems to be saying, I've looked at all of them. But he didn't do the things that you would have to do to prove infringement. But your job to counter that is to come back in your opposition to the motion of summary judgment and lay all that out. And we did. I didn't see that. Where in the record is your response to the summary judgment motion? Well, the response included the declarations of Mr. Jones and also the declaration of Dr. Chapman. And those are referred to in the appendix and also in our briefs, both of our briefs. There are several citations to those beginning... You raised this point of saying, well, you can't rely on Holmes. Where does he take issue with Holmes? Well, it's not that he takes issue with Holmes other than he points out that Holmes' measurements on the one shield, as he sets out in his declaration, that those measurements were faulty because they don't show a gap, an air gap, that in fact the dimensional information that was shown there was hardly the size of a human hair. Well, but that's with respect to the question of whether any of the shields infringe. What you started off your argument with is the proposition that since he only cut into one of them, that no inference can be drawn as to the rest. And what I think Judge Clevenger is asking, and I'm curious as well, is did you expressly and with specificity say to the district court in response to the summary judgment motion, wait, whatever other infirmities there are, and we believe there are other infirmities in the case of infringement, one of them is that he is only cut into one and there's no probative evidence with respect to the others. Did you make that argument to the district court? We didn't say it in those words, but we believe we said it through the declaration of Dr. Chapman, which goes into his sectioning a number of these shields and his conclusion that there's an ironing out of the metal, and also Mr. Jones, who testified in his declaration that you're stamping these things, these three sheets of metal that are planar, not with standoffs. Let me ask the question a different way. You didn't say it with all the verbiage that I used, but did you at any point say there's a difference among the different shields? We attached all the different shields. An important difference with respect to whatever inferences one might draw with respect to infringement. We thought we did, Your Honor, and in fact we believe we did because of the fact that we went through in a more generic way why you can't take this one small shield and use it as typical because we had denied in our responses to admissions that there was a typical shield. So that evidence was before the district judge when he entered summary judgment. And I think it's more important here to consider the basic issue of the other side admitting at trial that what they had represented to the court as the so-called typical shield wasn't in fact typical at all. The other side used figure 9 from the provisional application, which we clearly have stated in our papers is not typical. That in fact even using that, assuming it was typical, which it isn't, there was no evidence that there was elevated temperature that would cause any movement at all. In fact, the only evidence in the case was that the elevated temperature would have to be more than 800 degrees more than what the environment would have. And at trial, we were faced with, or the other side was faced with trying to establish willfulness. And so what do they say? They say, well, we disavow our presentation to you, Judge, about figure 9 because that figure was not the accused product and is not the accused product, and so therefore the opinion that was rendered on that figure is worthless and we should get our willfulness. And I don't think that is fair under the circumstances. I also don't think it's fair to characterize the testimony of Mr. Kring and Mr. Jones as being supportive of the fact that figure 9 is typical. In fact, as we point out in our reply brief, the testimony, when you actually lay it out on a piece of paper, does not provide that support at all. There's no reference to figure 9 in either one of these gentlemen's testimonies. So what did the district court have? It had Sheridan's representation that figure 9 was the typical shield. It was our position that, as we said in our response to the admission, which we submitted with the summary judgment papers, that is not the typical shield. And Dr. Chapman then went through not only the file history for the patent, but he also went through the description of why all of these shields, when you cross-section them, show one common characteristic, and that is the ironing out. And he also pointed out why there were factual issues. So at a minimum, at a minimum, we believe there were genuine issues of fact that we raised. Well, didn't the trial judge buy the notion that was advanced by your adversary that Dr. Chapman had conceded that there were air gaps? And that seems the district court opinion says Allen W. acknowledges that embossments separate the layer of his heat shield. They clearly create air gaps. Well, no, I don't think that the— What's the support in the record for the statement, should Allen ask the other side the same question, that Allen W. acknowledges that the embossments separate the layers? We only point out in Dr. Chapman's declaration, which I think is being referred to, that there is a very—because when you press these three planar pieces of metal together with this huge, high-tonnage press, there's still going to be, just from manufacturing tolerance, there's going to be some infinitesimal amount of space. You can't get perfect connection between all these pieces of metal in the embossment. But what he did was he identified that space as being dimensionally less than the size of a hair. And, of course, the patent itself, in its preferred embodiment, talks about an air gap that's anywhere from 10 to 30 times greater than that. And we're talking about a very thin part because at its final dimension, it's still only in the range of 20 thousandths to 30 thousandths of an inch in thickness after it's been pressed. So I don't think there's any support that relates to the infringement issue, which is what we have pointed to. And I think that— I may have misunderstood because I thought in the briefing that the blue brief at page 25 is taking Chapman's testimony and saying that otherwise Allen W. admits that the embossments separate the layers and there's enough separation. And since under the claim construction, the capacity to create an air gap is enough. Well, we don't—we didn't admit that, Ron. We didn't admit that the air gap that would be—it wasn't even an air gap. The dimensional tolerance separation would be considered an air gap because the patent requires a minimum of, as I said, 10— and we've cited this in our brief—10 to 30 times— Chapman's statement, which the other side picked on, was to say, Chapman states the embossments were intended only to increase rigidity of the product, not to create air gaps. And they read into that to say, well, you know, actually, since you've shown that there is some dimension between the two, then there's a potential air gap there. But the court, the lower court, determined, based upon the characterization from Sheridan, that there was going to be these huge gaps that occurred at elevated temperature. And that just is factually not correct. And it was also— Do you want to save your rebuttal, or do you want to keep going? No, I wouldn't save my rebuttal. All right. Thank you. Thank you. Mr. Susser. Thank you, Mayor, for your support. Stephen Susser for Appalachia Tech. Stephen Sheridan. The L&W is challenging the judge's affirmation of a jury verdict, finding Claim 7 valid. Question, then, on that point, Claim 7, is could a reasonable jury find that L&W had failed to meet its burden of clear and convincing evidence so as to prove that Claim 7 was invalid? Indeed, that is what happened. They failed to satisfy the burden. The jury found it, the judge affirmed it, and now they're coming back to second-guess it. There was a number of different pieces of evidence in the trial from which a reasonable jury could determine that even though it found Claim 1 to be invalid, Claim 7 was valid. First, the jury was pointed to statements by the patent examiner, and that's on 1599 of the joint appendix. And there, the PTO, the patent examiner, notes that a piece of prior art referred to as the foil family, a flimsy or flexible piece of prior art, one of several, states Sheridan's sheets would be in close proximity, i.e., biased towards each other, and goes on to say at 1599, Sheridan differs from the current claims in that his heat shield is not disclosed to be shaped for specific uses, which require bends and therefore may not have the type of in-plane stresses as preferred by applicant. I saw the definition that was adopted of biased, and it didn't actually help me very much in just a practical sense. What is your understanding of that term, and see if you can explain it in lay terms for me. When you have firm pieces of metal, not particularly flimsy, but relatively firm, as described in the written description, and they are joined at the edges, and they have embossments or bumps on them, what happens is those bumps at the same time push against one another, so as they try to separate, but because they're joined at the edges, the sheets are trying to come together. So there's this push-me-pull-me, if I can refer to Dr. Doolittle, where you have the sheets trying to come together, and yet being expanded apart by the embossments. All right, I'm fine with that. Thank you. And indeed, the jury, it's difficult to speculate as to what the jury may or may have thought, and that's one of the problems, I believe, with Allen W.'s argument, but the jury certainly had evidence to find that these flexible heat shields, what we call the foil family, exhibited biasing. They were tied at the edges, joined at the edges, and they had bumps. So the jury could have found they had biasing, but that they didn't show the in-plane stress to increase rigidity that was claimed in Claim 7. In other words, you could drape them over a chair, and they would just flop over like a towel. Indeed, this prior art that we argued against was designed to work with a carrier or a frame and not be a stand-alone product as our product was. Could I ask on the infringement point, what's the support in the record for the judge's statement that Allen W. acknowledges that embossments separate the layers of his heat shield? A number of points, Your Honor. I could begin by stating that their primary engineer and patent applicant testified that— Who was that? Excuse me, James Craig. Jim Craig, James Craig. Mr. Craig testified in his deposition that the Allen W. design, he referred to as the Allen W. design, was covered by his patent application. So this is a Crane and Jones testimony? Yes, Your Honor. So what else besides that? Well, if I could start with that, it's on JA 1967. It's spelled out in the brief. Okay. The next point, then, if you go actually to 953, Your Honor, and I do think this is important, 953, they have their patent application. Their very patent application reads under the field of the invention, they speak about— This is a figure 9 issue? It is a figure 9, Your Honor, exactly. So you think the trial judge was relying on the figure 9 issue? Well, it's not just figure 9, Your Honor. Well, it's Craig and Jones, and then Rule 59. What else? There's Crane, there's Jones, there's figure 9, there's the actual patent application, which is 953 continuing on in 955 in the appendix. There is Allen W.'s lawyer, law firm, Rainier, Fishman, and Grauer, where they state on 744, Your Honor, in their opinion, this was their non-infringement opinion. They write, quote, It is our understanding that the proposed commercial embodiments for Allen W.'s heat shield construction are substantially as described in Mr. Crane's written description and accompanying drawings. Your Honor, those drawings include, among others, figure 9. Again, when this very law firm that's now arguing for Allen W. gave a non-infringement opinion, they referred to figure 9 as the commercial embodiment, and it was only a trial that they did an about-face. Well, this particular passage that you just read doesn't specifically advert to figure 9. Are you saying that there was somewhere else that they specifically— Yes, Your Honor, but let me tie it together. Starting at 744 in the joint appendix and then going to 948 in the joint appendix, which is a few pages after, at the top of 948 is figure 9. Right. I have before me the whole opinion of non-infringement. The Court cares to look at it, but this figure 9 was attached as Exhibit C to the opinion. And if the Court were to look at footnote 3 in 744, it states, A copy of Mr. Crane's written description and drawings is attached as Exhibit C, an excerpt of which can be found from 944 through 951, I believe, at least through 949, and it includes figure 9, Your Honor, among others. There's no statement as such beyond the statement you just read, which is substantially as described in the written description and accompanying drawings that specifically ties the product to figure 9. You're just saying, well, figure 9 was among the drawings, right? Right. Figure 9 was among the drawings, Your Honor. It was—what we believe has happened is you have Mr. Crane, Mr. Jones, L&W's lawyer, and in fact their expert, if the Court were to turn to 1842 in the expert declaration of Kirby Chapman, under paragraph 44, Dr. Chapman, L&W's own expert, states, quote, in the second sentence, Moreover, it is obvious to one skilled in the art that the L&W heat shield has layers that are free to expand apart. So even their own expert in his declaration isn't contesting the fact that these layers can open up to create gaps. In the prior page, paragraph 36, which is JA 1840, he writes, last sentence, As a result, the sheets of the accused's products lie as proximate or close to each other as possible. He doesn't dispute that there are gaps, Your Honor. Well, but that would be—if you took a ream of paper and I plopped it down on the desk here, you would be able to say, I suppose, that there are gaps between each of the sheets of paper because they—given manufacturing tolerances, no matter how good they are, there will be imperfections in each sheet of paper that will create gaps, even though they may be at the micron or submicron level, depending on the quality of the paper. That's not what the patent is about, I take it. You wouldn't argue that something which was compressed as much as it possibly could be, short of welding it together, would be an infringement of this patent, would you? If the sheets were totally bonded together? No, the sheets are separate, but they are designed to be as flat as they possibly could and piled upon one another, and they were machined to the highest tolerance available under ordinary technology. But nonetheless, there would be some space there, maybe an angstrom of space between each sheet. You wouldn't argue that that would infringe, would you, because of the air spaces between the sheets? I would argue that if all the other characteristics were met, Your Honor, that even a small gap—very small, I'm not here to define exactly how small— but even a small gap has the heat-inhibiting properties that were designed to be addressed by the claims of the patent. If I can state, it goes beyond that, Your Honor, because L&W intended to create the air gaps in its accused products. On 953, it writes, The present invention to a thermal management system, and more particularly to a heat shield, and a method of manufacture thereof, that utilizes multiple layers provided with mated undulations that separate in a heated state to introduce insulated air gaps. This again is referring to their application in the Figure 9, right?  That's what I mean, but the other side's argument is that it's unfair to tax them in the infringement analysis with the application in the Figure 9, because they say they had clear evidence in front of the judge to say, wait a second, whatever the accused product is, it's not bad. Well, Your Honor, that's what they're saying, but I would dispute that. I mean, we do have James Crane, who is the person most familiar with it. Isn't the ultimate question whether there was a genuine issue of material fact in dispute on this very point? Correct Your Honor. And you think no, and the other side thinks yes. And we say the evidence says we don't say it. And if you're wrong on that, then there needs to be a trial, right? If the judge were wrong on that back then, and in light of all the evidence at the time, what they proposed and what they responded to and what they said, yes, I believe it is simply not the case. What's the answer on the question on these so-called inconsistent verdicts and on what happened at the trial as the judge was polling the jurors at the very end? I want to ask the other side the same thing. If you look at the record, it's actually in Volume 2 at the very end, I believe. The judge calls the jurors in and polls the jurors, right? This is on page 650 of the record. Gets the answers as to the validity issue and gets the damages. And then the judge says on page 651, I'm going to tell you you're discharged in a minute and then you'll be beyond further control of the court. Free from anything I have to do. And then he discharges the jury. And then he says to the parties anything anybody would like the record to reflect at this time. Now the jury's been discharged. Were the parties free after the jury had been discharged, after they left the courtroom at 4.41 p.m. to complain about inconsistent verdicts? Yes. Well, the other side has argued that they didn't have a chance because the jury got discharged. What happened? The record reflects that the counsel were entitled, if they wanted to, to talk to the jurors. You said you wanted to talk to the jurors, right? Did both sides go talk to the jurors? My recollection is Mr. Rader was there as well, yes, as were all the jurors back in the jury. I was certainly there. The jurors were all there. And my recollection, I can confirm it, but the recollection is Mr. Rader was there as well, asking the jurors what they found significant, et cetera. So your view is that if somebody had wanted to object, even though there had been a, quote, formal discharge of the jury, the jury was still on the property, and that if someone had made an objection saying, hey, wait a second, seven and ten are blatantly inconsistent, one and seven are probably inconsistent, and I'd like to have the jury explain to us the inconsistency, then there was an opportunity for that to happen. Your Honor, absolutely. Not only would I say that, but I would say it was if Mr. Rader felt it was a significant enough issue, he could have raised the issue even before the jury was discharged. In other words, he could have, on his own, proactively said to the jury. Well, he might have felt it was a bit rude to jump in front of the judge who was on somewhat of a roll here. Well, your basic point, I take it, in response to Judge Cleveringer's question, if I understand it, is that the point at which the judge said the words, you are discharged, was not actually the point at which the jury lost the capacity to decide to continue deliberations if the judge so instructed them, if the parties and the lawyers so desired. In other words, what usually happens in these situations is that if there's a problem with the verdict, the judge invites the lawyers to comment, one lawyer says, there's a problem here, there's an inconsistency, or this doesn't make any sense, or I can't read the writing, or whatever. And the judge says, you know, you're right. Ladies and gentlemen of the jury, I'm going to ask you to retire into the jury room for a little bit more deliberations and come back with an answer to this question that will resolve any ambiguity or whatever. The jury trots out, comes back ten minutes later, and you've got your answer. However, in this case, the wrinkle is that the judge, quote, discharged the jury at that point. They went off presumably either to pick up their stuff or wait for you all if they wanted to talk to you or whatever, but they were sort of on their way out at the point at which the judge asked for comments. And the question I have is, is it clear from the local procedure or any of the circumstances that were there that the judge could have or would have had the authority to say at that point, if somebody had spoken up in response to the invitation, please come back, go retire again, or is there some magic that attaches to the discharge? I will say this, Your Honor. I am not aware of any magic that would apply that would prevent the judge within seconds, literally, or minutes at most of discharging the jury from asking the jury back, reinstalling for purposes of addressing a question raised by one of the counsel. There's nothing that I am aware of. You're being a little hyper-technical, I suppose, too. I know my time's up. May I make one more point, Your Honor? I think we have it. Thank you. Mr. Rader? Could you tell us what happened about when the jury was discharged? The way the process was that the verdict was published, but we weren't given copies of it, so we were actually sitting there writing it down. At the time the judge announced six minutes later the jury was discharged. By the time we got back to the jury room, a number of the jurors had already left, so we didn't have an opportunity either to see the verdict or to even comment on the verdict before the jury was discharged. With respect to the— You would have had it read to you. Pardon? You would have had it read to you that the jury had found an independent claim not invalid and had found the claim depending from an invalid. Correct? That is correct. That has been read to you in the jury room. And you're a patent lawyer. You're not a negligence lawyer. I'm not saying, Your Honor, please. I'm not saying that we didn't recognize immediately, because Tanner was a defendant claiming that we didn't recognize immediately there may have been an inconsistency. You did recognize—I'm not saying we didn't. You did recognize immediately that there was a problem? Only in a moment. And we were never given an opportunity to even raise that issue before the jury was gone, which is not what I believe the process was intended to be. But coming back to the points that counsel made, first let me say again that there was no evidence in the record about Figure 9 or anything like Figure 9 being the commercial product. The opinion that's being referred to at the time of the summary judgment and even at trial, it was clear that that was not the product that had been commercialized. The opinion was done— Where do we know that it was clear that, although your infringement decision opinion may have been based on believing that the commercial embodiment was per Figure 9, by the time you get to trial you realize it was not, right? That's what you're telling me. Well, because the evidence and testimony was that— and even Mr. Kring testified to this— that he did an experiment on the provisional application, Figure 9, and determined that it took 1,000 degrees to get any movement, and so they abandoned that idea and went off in a different direction. And remember that the Figure 9 illustrates sheets that are of different thicknesses. And, of course, the accused product only has sheets that are of the same thickness. So Figure 9 was intended to deal with a situation where you get it up to 1,000 degrees, you may get some movement. It was a theoretical idea, which was abandoned. The other side knew that. Everybody knew that. In your opinion, in which you said that the provisional application and its figures are essentially the accused's device, what do we take from that? I was referring to the method of making the product, which would include taking three sheets of metal and then hemming them at the edges. And they're planar. There's no standoffs. They're not preformed like the patent requires. And you stamp it with these heavy presses. That's what it was for. But the patent talks about leaving air spaces. The patent application only talked about— I'm sorry, the application was never— The patent only talked about it in connection primarily with the air spaces that would be created at elevated temperatures. In Figure 9, any other gap would be, as you said earlier, just a tolerance issue, which you would get with any pieces of material that are sheet and set on one another. With respect to invalidity, I do want to point out that in the court's determination that in-plane stresses are created when the L and W heat shields are bent from planar to non-planar, it was Schertek's argument in the joint appendix at 38 and 39 that— and they gave an example of a deck of cards which was bent. In fact, they say in each half is bent. And so now they're saying that you could have a difference. In fact, what biasing is, Your Honor, to answer your question, is when you bend it and you have these sheets one on each other, you have a biasing that is a vertical biasing of the sheets coming together, and you have an in-plane stress, but both of which come from the process of bending. And therefore, Claims 1 and 7 are indistinguishable in terms of that issue. Claim 1 claimed biasing, which is the vertical component of that stress when you bend, and 7 claimed in-plane stress, which is the horizontal component of that bend when it's bent. And so— Okay. I think that's—we gave you enough extra time to make up for the extra time he had, so we'll take the case under submission.